UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| **CHRYS L. WIMMER,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | |
| | ) | **Cause No. 1:11-cv-1432-WTL-TAB** |
| **INDIANA MASONIC HOME, INC.,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## ENTRY ON MOTION FOR SUMMARY JUDGMENT

This cause is before the Court on the Defendant's motion for summary judgment. Dkt.

No. 41. The motion is now fully briefed, and the Court, being duly advised, rules as follows.[1]

## I.    STANDARD

Federal Rule of Civil Procedure 56(a) provides that summary judgment is appropriate "if

the movant shows that there is no genuine dispute as to any material fact and the movant is

entitled to judgment as a matter of law." In ruling on a motion for summary judgment, the Court

accepts as true the admissible evidence presented by the non-moving party and draws all

reasonable inferences in the non-movant's favor. *Zerante v. DeLuca*, 555 F.3d 582, 584 (7th Cir.

2009). However, "[a] party who bears the burden of proof on a particular issue may not rest on

its pleadings, but must affirmatively demonstrate, by specific factual allegations, that there is a

genuine issue of material fact that requires trial." *Id.* Finally, the non-moving party bears the

burden of specifically identifying the relevant evidence of record, and "the court is not required

---

[1] The Defendant moves to strike the Plaintiff's surreply. Dkt. No. 68. **That motion is
DENIED.** The Plaintiff's motion for an extension of time to file a response to the Defendant's
motion to strike the Plaintiff's surreply is **DENIED AS MOOT.** Dkt. No. 70.

to scour the record in search of evidence to defeat a motion for summary judgment." *Ritchie v. Glidden Co.*, 242 F.3d 713, 723 (7th Cir. 2001).

## II.    **BACKGROUND**

Plaintiff Chrys Wimmer was hired as a Certified Nursing Assistant ("CNA") in 2002 by Defendant Indiana Masonic Home, Inc. ("IMH"), a continuing care retirement community located in Franklin, Indiana. In 2010, when the subject incidents of this lawsuit occurred, Wimmer was fifty years old, and she considered herself an experienced, older, attractive female nurse. Wimmer tried to keep herself neat and attractive at work; for example, she ironed her scrubs, manicured her nails, and always wore makeup. However, in response, Wimmer's coworkers took to calling her "Barbie" and sometimes, "bitch Barbie." Coworkers, nurse Rhonda Montgomery in particular, also called her "stupid," "bitch," "fucking bitch," and, as if that weren't enough, "fucking stupid drunken bitch." According to Wimmer, "I'm well-kempt, and I was being harassed because of it." Wimmer Dep. at 83:19-20. She explained further:

> Q.    … [A]t the very end of paragraph ten, it states that Ms. [Watkins] and these other employees did these things because [you were] a nice-looking female over the age of 40. How do you know that was the reason?
>
> A.    Because I am, and I was. I was older than them, and a lot of time I heard my girls were beautiful; my grandkids were beautiful, and actually I'm 53. So it's like, well, you know, I was born this way, and honestly, they were overweight and not, not blessed as much, if that's what you want to call it.
>
> Q.    Did any of them ever tell you that's the reason they didn't like you?
>
> A.    They didn't tell me that.
>
> Q.    Did anybody else ever tell you that's the reason they didn't like you?
>
> A.    Yes.

Wimmer Dep. at 205:4-22. Although the name calling may have started with just a few coworkers, other employees began calling Wimmer "Barbie" as well. The name-calling persisted

2

over the last eight years of Wimmer's employment with IMH, and when Wimmer worked full-time, she was called "Barbie" three or four times a week. It is this treatment that forms part of Wimmer's complaint in the instant case.

### A.     Wimmer's Work as an LPN

Several years after her hire, Wimmer became a Licensed Practical Nurse ("LPN"). LPNs are generally responsible for ensuring that patient care is administered according to doctors' and registered nurses' instructions. IMH employs numerous LPNs, all of whom report to Director of Nursing Lesley Watkins ("Watkins"). Watkins works on site at IMH during the week and is on-call during evenings and weekends. When she is not physically present at IMH, an LPN or RN is designated as "House Supervisor" and bears full authority and responsibility for operations in Watkins' stead.

Wimmer complained to her supervisor, human resources, and Watkins about employees calling her names. Wimmer raised the issue of name-calling with Watkins twice – once regarding "Barbie" and once regarding an incident in which coworker and LPN Rhonda Montgomery called her a "fucking stupid drunken bitch." When Wimmer complained about being called "Barbie," Wimmer told Watkins,

> "I felt like I was being harassed, basically being made fun of, because I iron my scrubs. I wash my hair. I brush my teeth. I wear makeup to work. My nails are done, and I was being harassed, and I said they're, they're calling me Barbie.

Wimmer Dep. at 87:20-25. Watkins laughed and said that she (Watkins) used to be a pretty woman, too. Watkins had heard IMH employees call Wimmer "Barbie," and after Wimmer complained, she told three or four nurses with whom Wimmer worked that Wimmer's name was not "Barbie," the nickname offended Wimmer, and they should stop calling her that name.

After Wimmer complained about Montgomery's remark, Watkins asked Montgomery whether she had said it, and when Montgomery confirmed that she had, Watkins asked her to apologize. Montgomery did not, however, apologize to Wimmer.

Wimmer was also told by a coworker that Montgomery checked Wimmer's nursing notes; Wimmer believes that Montgomery did this to seek out Wimmer's mistakes and get her in trouble.

Wimmer also described two incidents in which she felt physically threatened by Montgomery and Watkins. Although the context is not entirely clear, the record is that Montgomery once cornered Wimmer in the "pantry" of a unit and "told [Wimmer] that [Watkins] told her to walk me out, or clock me out, or something," which threats referred to being written up. Wimmer Dep. at 216:2-18. Watkins also once pulled Wimmer over in the hall regarding an issue with "butt creams," leaned in "really, really close" and said "you do it again, I'll get you." Wimmer Dep. at 216:21-25. Watkins admitted in her deposition that she "didn't particularly care for" Wimmer, because "she appeared to try to cause trouble for everybody else." Watkins Dep. at 79:19-25.

While Wimmer started out working full-time, she later went to part-time, working thirty hours a week. In April 2010, Wimmer worked without a set schedule, on "Per Required Need" ("PRN") status. However, human resources representative Patsy Cooper asked Wimmer to change from "PRN" status to a full-time shift. Wimmer hesitated because of the "harassment" she had been suffering – being called "Barbie" and "Barbie Bitch" – but Cooper reassured Wimmer that "they don't allow that to happen any longer." Wimmer Dep. at 162:9-163:11. Wimmer filled out the paperwork and waited for the papers to be approved by Watkins. However, Watkins never approved the paperwork. Wimmer believes that there are two reasons

why the paperwork was never approved. First, Wimmer complained to the administration about Watkins' workplace misconduct. Second, Watkins is biased against those older than her.

### B.      Denial of a Position and Watkins' Workplace Misconduct

Sometime before June 19, 2010, Watkins approached IMH Administrator Greg Limeberry to discuss her desire to date IMH Maintenance Supervisor Tim Watkins.[2] Limeberry later encouraged Watkins to keep her relationship with Mr. Watkins "low-key."

According to Watkins, another employee of IMH, Donna Gaskins, a radiologic technologist, had been dating and living with Mr. Watkins. Wimmer called Gaskins on July 5, 2010, to express her sympathy and support for Gaskins because Watkins was now dating Mr. Watkins. Unbeknownst to Wimmer, Gaskins had not known that Watkins was dating Mr. Watkins. Gaskins then called Watkins and told her that she should not be dating Mr. Watkins because she (Gaskins) was dating him. Watkins informed her that Mr. Watkins had told her (Watkins) that they were no longer dating and that they (Watkins and Mr. Watkins) would continue to date as long as they wanted to.

According to Watkins, she then attempted to avoid Gaskins, who was "cold" to her and gave her dirty looks in the hallway. However, according to Gaskins, Watkins began to flaunt her relationship with Mr. Watkins at work by rubbing against him in the parking lot, sitting in his truck in the parking lot, and putting her hand down his pants in view of other IMH employees. Gaskins, Wimmer, and other nurses complained about these actions to the human resources department.

---

[2] Now her husband, hence the last name "Watkins."

Wimmer believes that Watkins retaliated against her for complaining about Watkins and Mr. Watkins' actions to Limeberry. Wimmer described two of these incidents involving Watkins and Mr. Watkins at her deposition.

One evening, Watkins went out into the parking lot to get a warmer shirt to wear. Watkins and Mr. Watkins were standing near the IMH picnic tables that were to the left of the door Watkins exited. Wimmer observed the two of them "up against each other, face to face, body to body, buttocks on each hand, . . . like it was a sex show." Wimmer Dep. at 179:3-5. Wimmer then "skedaddled" back into the building. *Id.* at 179:6.

 Wimmer later went into Watkins' office to talk to her about the full-time position she had applied for at Cooper's urging. As she walked in, Watkins gestured to Mr. Watkins, who was in her office at the time. Wimmer turned and saw Mr. Watkins with his hands on his crotch, asking Watkins "if he was going to get some big fat juicy pussy tonite." Wimmer Dep. at 179:6-21. Wimmer quickly excused herself and left the room. She immediately reported the incident to Cooper. Wimmer also mentioned "all the sex stuff" to Limeberry once when she saw him in the hallway. She told him about the parking lot incident and the incident when she walked in on the Watkinses in Watkins' office. At that time, Wimmer also asked Limeberry what was happening with her paperwork for the full-time position.

Watkins did not sign Wimmer's paperwork. Although Watkins contends that this is but one position in a long line of positions she was denied, IMH has no record of any postings or requests submitted by Wimmer for full-time positions after 2007. According to Wimmer, the position she applied for was "held open" and eventually given to another, younger nurse who had

not passed her RN exam at the time Wimmer was passed over by Watkins.[3] According to

Wimmer, one reason Watkins did not promote her was because Wimmer did not go out drinking

with Watkins and her friends.

C.      **Events Preceding Wimmer's Discharge**

In summer 2006, Wimmer was involved in a disagreement with Montgomery. Wimmer

believes that Montgomery did not respond quickly enough when a patient needed help and

Montgomery was trying to "set her up." Wimmer Dep. 91:9. Thereafter, in separate

conversations, both Wimmer and Montgomery told Watkins that they preferred not to work with

each other. Accordingly, although it was infeasible to completely eliminate any possibility of

contact between the two, Watkins consistently scheduled Wimmer and Montgomery to work in

physically separate units from that point forward. Wimmer also told the staffing coordinator that

she didn't want to work before, during, or after any of Montgomery's shifts, which meant that

Wimmer lost work hours.

Another acute conflict arose, however, in 2010. On the evening of Sunday, August 29,

2010, Wimmer observed Montgomery withdraw excessive amounts of morphine from a

controlled-access medical container known as an emergency drug kit or "EDK."[4]

As part of her duties, Wimmer had the key to the medicine room and was responsible for

the medicine. On that evening, Montgomery asked Wimmer for the key to the medicine room,

but instead, Wimmer unlocked the room for Montgomery and kept the key. While Montgomery

---

[3] Wimmer did not have her RN certification, but testified at her deposition that she was
thinking about getting it at the time she was working at IMH. Wimmer Dep. at 181:14-182:4.

[4] There is no pharmacy on site at IMH; rather, there is an off-site pharmacy that makes
regular deliveries to IMH. The EDK is used when an IMH patient needs medication but cannot
wait for the delivery.

7

was in the medicine room, IMH Security Guard Vonda Johnson arrived in the area and made

small talk with Wimmer. From their respective locations, Wimmer and Johnson could not see

Montgomery while she was in the medicine room, and Montgomery could not see Wimmer and

Johnson. After several minutes, Montgomery came out of the room. Wimmer saw that

Montgomery had two syringes, each containing three milliliters of liquid morphine.

On seeing this, Wimmer said to Johnson, "Oh my gosh, that's a lot of morphine."

Wimmer then observed Montgomery wait to board an elevator, holding the syringes "like a

bouquet of flowers." Wimmer Dep. at 110:15. In her deposition, Wimmer testified to what went

through her mind when she saw Montgomery with the syringes:[5]

> In my mind, I knew there was never going to be a dose of six [milliliters] given to
> anyone in a long-term care facility, or ever, even in a hospice situation. That is a
> lot of sublingual morphine. So it – I mean I got chills in my arms.

*Id*. at 110:6-10. Wimmer then went into the medicine room to investigate. She found the

wrappers from the syringes lying next to the trash can, but she found neither the foil lid nor the

small morphine pot (a container about half the size of a Dixie cup) from which syringes are

filled. Wimmer showed the trashcan to Johnson and asked her to call the House Supervisor at the

time, Carol Fine. Wimmer also called the pharmacy to inquire whether it had authorized the

withdrawal of morphine for a particular patient; the pharmacy indicated that it had not. Wimmer

inquired as to the quantity in the morphine cup, because she believed that, per regulation, any

unused morphine was to be destroyed in the presence of two nurses.

---

[5] In her response, Wimmer makes much of Montgomery's past; specifically, Montgomery had a history of drug abuse and her nursing license was on "indefinite probation." However, Wimmer admitted in her deposition that she did not know about Montgomery's past until after this incident occurred. Wimmer Dep. at 224:4-12 ("[An employee from the Attorney General's office] wouldn't share [any information] with me, and it was all questions about the State Board of Health had flagged [Montgomery], and I didn't know any of this, because of her past experiences.").

When Fine arrived, Wimmer relayed what she had observed. Fine replied, "Oh gosh, don't get me in the middle of this." Fine then went into the medicine room and looked around and returned with the wrappers from the syringes. According to Wimmer, Fine then returned, "grumbling" about the necessary paperwork and calling Watkins at home. Wimmer asked Fine to check Montgomery's "med box" to check for the morphine, but Fine refused. Fine told Wimmer she was going to call Watkins and she left the unit.

When Fine called her, Watkins directed Fine to investigate and see if she could account for the morphine that was removed from the EDK. Fine described what she did next:[6]

> I made sure that [the medicine] had been signed out. I took an inventory of the EDK box to make sure nothing else was missing. I determined the only thing that had been taken out of that box was the medication that had been signed out. I xeroxed that slip where she had signed that out, went to the computer to make sure there was an order in the computer, and called my director of nursing.

Fine Dep. at 40:5-12. Fine also asked Johnson to write a statement, which Johnson did. Fine then called Watkins back. Watkins described their conversation as follows:

> [Fine] called and let me know that [Montgomery] had given one dose and had taken the other dose from – the medicine is dispensed in a 5-milliliter cup, sealed from the manufacturer. There's enough in there for two doses. So [Montgomery] drew up two syringes with two-and-a-half milliliters apiece, and she said that she gave – gave the resident the dose at 4:00 p.m. and saved the other syringe to give at 8:00 p.m. so she wouldn't have to waste the morphine.

Watkins Dep. at 91:11-19. Watkins asked Fine to document her investigation and leave it for Watkins to review the next day. Ultimately, Watkins reviewed Fine's report, as well as the charge slips for the narcotic EDK, the Medicine Administration Record, and the nurse's notes that Montgomery had written, and determined that "it didn't appear that [Montgomery] had done anything wrong," Watkins Dep. at 92:21-22, although Watkins testified in her deposition that

---

[6] Throughout her statement of facts, Wimmer repeatedly contends that "nothing was done" as far as investigating what had happened. However, as IMH points out, Wimmer is not necessarily in a position to know whether anything was done to investigate, and if so, what.

"presetting medication" – preparing a dosage in advance of its administration – was against IMH policy and state law.

That Monday, Watkins talked to Limeberry and HR Director Kat Cooper[7] about the incident. Although she did not contact Wimmer, she again determined that no further action was required. Watkins told Limeberry, Cooper, and acting IMH CEO Stan Klaus that it seemed like Wimmer was just trying to get Montgomery in trouble.

On Tuesday, August 31, 2010, Wimmer attempted to contact Limeberry by phone but, finding him unavailable, spoke instead with his administrative assistant, Cyndi Wines. Wimmer recounted her version of events to Wines. Wines documented the conversation, told Wimmer she would pass along the information to Limeberry, and thereafter did so.

Later that same day, Fine reported to Wines that Wimmer had called Fine at home to discuss the events of August 29.[8] On Thursday, September 2, 2010, Fine advised Watkins that Fine had changed her phone number so that Wimmer would not be able to call her anymore.

According to Wimmer, it was Fine who continued to call Wimmer. On September 17, Fine called Wimmer and threatened Wimmer after her unemployment hearing.[9] Fine told

---

[7] Not to be confused with Patsy Cooper, the human resources representative who encouraged Wimmer to apply for the full-time position and to whom Wimmer complained about Mr. Watkins' behavior in Watkins' office.

[8] IMH asserts that Wimmer told Fine that IMH "would be sorry" if her concerns regarding Montgomery were not handled. In support, IMH cites the affidavit of Limeberry, itself citing what RN Danea Harter told Limeberry that Fine had told her Wimmer had said. IMH also cites a record purporting to be an account of that conversation written by Fine in which Fine states that Wimmer told her that IMH "would be sorry." However, Wimmer points out that Fine did not testify during her deposition that Wimmer said this. Resolving all evidentiary questions in favor of Wimmer, the Court neither includes this allegation in its statement of facts nor considers this fact in its analysis.

[9] It is unclear why Wimmer attended an unemployment hearing before her employment with IMH was terminated, which occurred at the earliest on September 20, 2010.

Wimmer: "[D]on't do this. You're making a big mistake. You need to drop it. They're going to rip you apart. They're going to get you on med errors." Wimmer Dep. at 146:2-7. On March 3, 2011, Fine called Wimmer again. Wimmer told Fine not to call her anymore and Wimmer then blocked Fine's cell phone number for six months.

On Tuesday, September 7, 2010, Wimmer again contacted administrative assistant Wines. Wimmer asked what was being or had been done and stated, "I know she still works there. What has to be done to get her out of there?" Wines Dep. at 16:9-17:6; Exh. 15. Wines told Wimmer that Wimmer should not be discussing the ongoing investigation with anyone other than Limeberry or Watkins. Wines reported this conversation with Wimmer to Limeberry and forwarded her notes from both of her conversations with Wimmer to HR Director Cooper.

Cooper reviewed Wines' statements regarding Wimmer's phone calls with Wines. Cooper also spoke with Watkins and reviewed Fine's August 29, 2010, statement. In addition, Cooper spoke to Wimmer, who again recounted her version of what occurred on August 29.

When Wimmer was unable to talk to IMH management about the incident, she called the Indiana State Department of Health on September 9, 2010. On September 16, 2010, the Indiana State Department of Health ("ISDH") initiated an on-site survey based in part on Wimmer's report. In the course of its review, the ISDH informed Watkins that it would be issuing a low-level regulatory citation to IMH based on a finding that Montgomery had preset medication. IMH issued Montgomery a written warning for presetting and later conducted employee counseling on presetting.

During its investigation of the incident, an employee of the Attorney General's office told Wimmer that she had to report the crime to the Franklin Police Department, or she "would be

held accountable for knowingly allowing it to happen." Wimmer Dep. at 224:13-23. Wimmer called the Franklin Police Department on September 21, 2010.

On September 21, 2010, Shift Supervisor Danea Herter reported to IMH another conversation she had with Fine in which Fine relayed a conversation she had with Wimmer. Although Limeberry recalls that Harter's version of the conversation was that Wimmer told Fine, "they should just all be shot Greg [Limeberry], Lesley [Watkins] and Kat [Cooper] – I have a gun and I know how to use it – I should just do it myself," Harter's own subsequent written recollection is that Fine told Harter that Wimmer had said that she "could just kill us all." According to Fine, Wimmer never said anything about a gun.[10]

By letter dated September 20, 2010, Watkins terminated Wimmer's employment with IMH, effective that same day. Watkins testified that she terminated Wimmer's employment because "[s]he kept calling, insisting that [Montgomery] had stolen morphine. She kept insisting that [Montgomery] needed to be [fired]. She was really trying to determine the course of an investigation." Watkins Dep. at 102:13-16. Although the letter is dated September 20, 2010, it is unclear when the decision to terminate Wimmer actually occurred, as HR Director Cooper's testimony shows:

> A.    I reviewed the information that I had received. And then when she contacted -- she had contacted Cyndi Wines a second time, wanting to know the results and why an employee had not been terminated, her con – her continual trying to get information about a confidential investigation. It's not our protocol to give line staff information about investigations. That's called a confidential issue.
>
> Q.    Did you do anything else to investigate against Chrys Wimmer?
>
> A.    I finished my investigation.
>
> Q.    How did you finish it?

---

[10] Wimmer contends that Fine testified in her deposition that "it was Harter that was trying to get Fine to say that Wimmer had a gun," but the record does not bear this out. Fine Dep. 86:20-87:22.

A.      I spoke with Dr. Limeberry and Ms. Watkins to understand what they thought, show them my results, got their input. And then Dr. Limeberry advised that I speak to Stan, I think his name – I always want to say Stan Winston, but that's not right. Stan Klaus. He was interim CEO through LCS. We did not have – Brian Lane had not started at that time.

Q.      What did you show Greg when you say you showed him the results?

A.      I – pardon me. I misspoke. I reviewed the information with him and showed him those documents.

Q.      What documents?

A.      The one from Ms. Harter, the one from Ms. Fine, the ones from Ms. Wines. Sorry.

Q.      And what did you tell Greg Limeberry?

A.      I discussed the fact with him that I was concerned for endangerment of employees and residents and that it was unethical conduct to threaten staff by saying that you were going to do something to them if something wasn't done, and the fact that the gun issue, which I've mentioned previously, had come up about harming or shooting someone. The primary reason of a continuing-care retirement community is to – is a safe haven for our residents to live. It's their home. When I see potential harm to the staff or residents, I need to look into that issue. When those items were brought to me, investigated it, and then I met with them. And then Greg said I need to talk to Stan and find out what he wants me to do.

Q.      And what did you tell Stan?

A.      I told him the same thing I just stated and that Greg and – Greg Limeberry, pardon me, and Lesley Watkins were in agreement that they thought there should be a termination, and Stan agreed.

Q.      That's after Lesley brought you the termination letter?

A.      Uh-huh.

Q.      Is that yes?

A.      Yes. Sorry.

Q.      All right. So these conversations that you're telling us now about you talking to Greg and you talking to Stan is after Lesley brought you the draft letter of termination; is that correct?

A.      No, that was created after Stan – pardon me. After Stan said to put the termination together. It was presented that the termination would be based upon our conduct policy 1-25. Employee conduct, pardon me.

[. . . .]

Q.      All right. Thank you. Did you go to Stan after Lesley talked to you about
        terminating Chrys Wimmer?

A.      After the discussion between Greg and Lesley and I. That's when Greg said I
        should talk to Stan.

Q.      And what did Lesley say in that meeting?

A.      What I've already said.

Q.      That Chrys Wimmer should be terminated?

A.      Yes. I don't remember anything else that – that she said.

Cooper Dep. at 100:14-104:4.

Regardless of when the decision was made, Wimmer actually received the September 20

letter on September 23. Wimmer Dep. at 224:22. She testified that, after August 29, she was not

scheduled to work any more hours.

Wimmer submitted a Charge form to the EEOC on March 18, 2011, though there was

never a charge number assigned to it. On March 22, 2011, Wimmer submitted another Charge

form to which a charge number was actually assigned. Also on March 22, Wimmer completed an

EEOC intake questionnaire.

On October 26, 2011, Wimmer filed the instant suit against IMH, asserting claims of age

and gender discrimination, harassment, and retaliation. IMH moves for summary judgment on

each of Wimmer's claims.

### III.     DISCUSSION

#### A.     Wrongful Discharge

In her count 3, Wimmer claims that she was fired in part[11] because "she refused to commit an illegal act for which she could have been personally liable." Compl. at ¶ 52, Dkt. No. 1. IMH contends that they are entitled to summary judgment on this claim because Wimmer cannot point to any illegal act that she refused to commit.

"Indiana follows the doctrine of employment at will, under which employment may be terminated by either party at will, with or without reason." *Baker v. Tremco Inc.*, 917 N.E.2d 650, 653 (Ind. 2009) (citations omitted). There are but a few narrow exceptions to this doctrine, *id.* at 653-54, and Wimmer argues that she falls within one of them. Specifically, Indiana recognizes a "public policy exception" if "a clear statutory expression of a right or duty is contravened." *Id.* at 654. This exception includes a situation in which "an employer discharges an employee for refusing to commit an illegal act for which the employee would be personally liable." *Id.*

The circumstances of this case present a unique twist on the paradigm. While the "illegal act" is usually an affirmative one, such as driving an overweight truck, *see McClanahan v. Remington Freight Lines, Inc.*, 517 N.E.2d 390, 392-93 (Ind. 1988), here the assertedly illegal act is one of omission – failure to report a possible crime. However, despite repeated prodding by IMH, Wimmer fails to put forth any evidence that failure to report the crime alleged here is an illegal act. Wimmer *argues* that she would have been criminally liable for failing to report Montgomery's alleged theft of morphine, but she points to no *evidence* of that fact. For example,

---

[11] She also claims she was fired for complaining about age and sex discrimination; those claims will be addressed in their respective sections below.

she does not cite to a statute imposing a duty to report. She does cite law enforcement officials'
statements to her that she would have been held liable, but (il)legality does not rest on the mere
say-so of law enforcement officials.[12]

Wimmer has simply failed to designate any evidence to support the assertion that
remaining silent would have subjected her to criminal penalty. To be sure, the Indiana legislative
assembly is capable of clearly articulating statutory reporting duties, *see, e.g.*, Ind. Code § 31-33-
5-1 ("An individual who has reason to believe that a child is a victim of child abuse or neglect
shall make a report as required by this article."), but Wimmer fails to point to one here.
Furthermore, the illegal act allegedly committed by Montgomery[13] is not transferrable to
Wimmer for the purposes of this claim. Rather, she must point to a duty she was required to
perform, the neglect of which would have rendered her criminally liable.[14] She has not done so,
and IMH is therefore entitled to summary judgment on this claim.

## B.       ADEA EEOC Discrimination Charge

IMH contends that Wimmer's ADEA claims must fail because she failed to file a timely
charge of age discrimination with the EEOC. An ADEA plaintiff must file a charge of
discrimination with the EEOC within 180 days of the challenged employment action, 29 U.S.C.
§ 626(d)(1)(A), and it is undisputed by the parties that the deadline for Wimmer was March 19,
2011. The evidence of record is that Wimmer submitted a charge form to the EEOC on March

---

[12] Wimmer contends that evidence of what she was told speaks to her state of mind, but
Wimmer has not shown that her state of mind is relevant to this claim in the first place.

[13] Wimmer points to Ind. Code §§ 35-43-4-2 (theft; receiving stolen property); 35-43-4-3
(conversion); 35-48-4-6 (unlawful possession of a narcotic); 35-48-4-1 (dealing narcotics).

[14] Wimmer also contends that she would have been liable for aiding and abetting
Montgomery had she not reported what she saw. However, Wimmer cites no evidence – such as
an aiding and abetting statute – and makes no further argument in support of this assertion.

18, 2011, though no charge number was ever assigned to it, and completed an EEOC intake questionnaire on March 22, 2011, to which a charge number was eventually assigned.

"[I]f a filing is to be deemed a charge it must be reasonably construed as a request for the agency to take remedial action to protect the employee's rights or otherwise settle a dispute between the employer and the employee." *Swearnigen-El v. Cook Cty. Sheriff's Dep't.*, 602 F.3d 852, 865 (7th Cir. 2010). Wimmer's March 18 charge meets this standard. IMH makes much of the fact that Wimmer checked a box on her March 22 form providing, "I want to talk to an EEOC employee before deciding whether to file a charge. I understand that by checking this box, I have not filed a charge with the EEOC. I also understand that I could lose my rights if I do not file a charge in time." However, IMH has cited no legal authority for the position that Wimmer's subsequent state of mind – as manifested on a form undisputably filed after the deadline – has any impact on whether her prior charge form could be reasonably construed as a request for the EEOC to take action. IMH is not entitled to summary judgment on Wimmer's ADEA claim on this basis.

## C.    Sex and Age Discrimination

In her counts 1 and 2, Wimmer alleges that IMH discriminated against her on the basis of her sex in violation of Title VII and her age in violation of the ADEA.

Title VII makes it unlawful for an employer to "fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex." 42 U.S.C. § 2000e–2(a)(1). Similarly, under the ADEA, it is unlawful for an employer to "fail or refuse to hire or to discharge any individual or otherwise discriminate against any

individual with respect to [her] compensations, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a)(1).

To survive a motion for summary judgment on a Title VII or ADEA disparate treatment and discharge claim, a plaintiff must present evidence of intentional discrimination through either the direct or indirect method. *See Oest v. Ill. Dep't. of Corr.,* 240 F.3d 605, 611 (7th Cir. 2001); *Fleishman v. Cont'l Cas. Co.*, 698 F.3d 598, 603 (7th Cir. 2012).

"To avoid summary judgment under the direct approach, the plaintiff must produce sufficient evidence, either direct or circumstantial, to create a triable question of intentional discrimination in the employer's decision." *Silverman v. Bd. of Educ. of City of Chicago,* 637 F.3d 729, 733 (7th Cir. 2011). Direct evidence reveals the decisionmaker's discriminatory intent without reliance on inference or presumption. *Id.* at 734. It amounts to an acknowledgement of discriminatory intent by the decisionmaker. *Gorence v. Eagle Food Ctrs., Inc.,* 242 F.3d 759, 762 (7th Cir.2001) (explaining that employers are unlikely to be caught making statements that directly evidence discrimination, such as "I fired Judy because she was an old woman.").

When evidence of such direct statements is not present, a plaintiff can survive summary judgment by "constructing a convincing mosaic of circumstantial evidence" that would permit a reasonable jury "to infer intentional discrimination by the decisionmaker." *Ridings v. Riverside Med. Ctr.,* 537 F.3d 755, 771 (7th Cir. 2008). The circumstantial evidence, however, "must point directly to a discriminatory reason for the employer's action." *Adams v. Wal-Mart Stores, Inc.,* 324 F.3d 935, 939 (7th Cir. 2003).

To avoid summary judgment under the indirect method, a plaintiff must offer evidence that (1) she belongs to a protected class; (2) her performance met her employer's legitimate expectations; (3) she suffered an adverse employment action; and (4) a similarly situated

employee not in her protected class received more favorable treatment. *Brummett v. Sinclair Broad. Grp. Inc.,* 414 F.3d 686, 692 (7th Cir. 2005). Once the plaintiff has established her prima facie case, the burden shifts to the employer to present a legitimate and non-discriminatory reason for the employment action. *Id.* On such a showing, the burden then shifts back to the plaintiff to show that the employer's proffered reason is a pretext for discrimination. *Id.* However, if a "plaintiff is unable to establish each element of this prima facie case, summary judgment must be entered in favor of the defendant." *Anders v. Waste Mgmt. of Wis.,* 463 F.3d 670, 676 (7th Cir.2006).

In briefing these claims, IMH and Wimmer discuss these claims as if they were one combined claim for sex-age discrimination. It is not surprising that the parties have done so, as Wimmer's chief complaint is that she was targeted for being, through no fault of her own, the "perfect storm" of a beautiful, older woman. However, while true to her complaint, analysis in this manner poses a number of difficulties.

Although not recognized as such by Wimmer, the Court notes that Wimmer's claim is in the nature of a "sex-plus" claim, a theory of discrimination in which not all members of a disfavored class suffer discrimination; rather, a subclass of men or women (but not both) are treated differently on account of the "plus" characteristic. As an initial matter, the Seventh Circuit has thus far declined to adopt this theory of discrimination. *Coffman v. Indianapolis Fire Dep't.*, 578 F.3d 559, 564 (7th Cir. 2009). Further complicating matters, Wimmer's claim is more of a "sex-plus-plus" claim where one of the "plus" categories is itself a protected characteristic – age. Fortunately, however, at least one aspect of this theory is clear: whether or not a "sex-age-plus" theory of discrimination is recognized, at bottom Wimmer must demonstrate that the actions she complains of occurred at least in part because she is female or

because of her age. *See id.* at 564 ("Whether or not we explicitly recognize 'sex plus height' as a vehicle for Title VII discrimination suit, Coffman must demonstrate that the [adverse actions] occurred at least in part because she is female."). The question on summary judgment, then, is the same as in sex or age discrimination claims generally: whether Wimmer has designated evidence from which a reasonable jury could conclude that she suffered an adverse employment action on account of her sex or age.

Wimmer contends that she was given fewer part-time hours, was denied a full-time position, and eventually was discharged on account of her sex and age. In its brief on the instant motion, IMH argues that Wimmer cannot point to any similarly-situated male comparators treated better than she with respect to denial of hours, a full time position, or discharge.

In her response, Wimmer asserts simply that there is no requirement comparators be outside the protected class.[15] Regarding her age discrimination claim, Wimmer is correct. *See O'Connor v. Consol. Coin Caterers Corp.*, 517 U.S. 308, 312 (1996), *cited in Runyon v. Applied Extrusion Techs., Inc.*, 619 F.3d 735, 740 (7th Cir. 2010). Comparators in an age discrimination case are persons "substantially younger" than the plaintiff, regardless of whether they too are members of the protected class (that is, those age 40 and over). *O'Connor*, 517 U.S. at 312. However, with respect to sex discrimination, Wimmer is mistaken. While the alleged harasser need not be of the opposite sex, *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 79 (1998), comparators must be, for it is by their similarly-situated–yet-opposite-sex status, combined with their better treatment, that the inference of discrimination on the basis of sex arises. *E.g.*, *Luster v. Illinois Dep't. of Corr.*, 652 F.3d 726, 730 (7th Cir. 2011).

---

[15] Wimmer does not explicitly adopt any particular method of proof; rather, she simply responds in kind to IMH's contention that she cannot survive summary judgment under the indirect method.

Given that Wimmer's claim is a twist on a "sex-plus" claim, one must draw comparative lines in such a way as to isolate the protected characteristics from other, potentially determinative characteristics. Thus, on the question of sex discrimination, Wimmer could point to (1) attractive males who were treated better than she; or (2) substantially older males who were treated better than she. On the question of age discrimination, Wimmer could point to (1) substantially younger females who were treated better than she; or (2) attractive substantially younger persons who were treated better than she.[16]

Here, Wimmer does not articulate how any similarly-situated male was treated better than she with regard to the type of adverse employment actions she complains about. Rather, Wimmer contends generally that there is evidence that males were treated differently than females:

> [T]he younger less attractive female employees flirted with male employees and [Watkins] even used her position of authority to take away the male maintenance employee boyfriend from [Gaskins], flaunted her sexual fondling of the maintenance man at work, and had input into the termination of [Gaskins], the termination of [Wimmer] and the retaliation against another older female nurse. [ . . . .] The younger less attractive [Watkins] and her friends used their employment influence to obtain sex. The male Administrator obtained sex from females he supervised and could not take corrective action.

Wimmer Resp. at 31-32, No. 58. She further elaborates on her theory in her surreply:

> Furthermore, [IMH] treated [Wimmer] worse than the male employees, such as Tim Watkins who engaged in the sex harassment of gross sexual statements and sexual fondling at work. [IMH] also treated [Wimmer] worse than Limeberry, who had sex with his subordinate employee, Gaskins, and who had his secretary living with him. The undisputed testimony of Mrs. Wimmer is that [Watkins] treated men, such as Joe Rowe, better than she treated women. Wimmer Dep. 183. Ms. Gaskins testified that [IMH] treated male employees better than it treated

---

[16] Although dissimilar to Wimmer, evidence that unattractive females or substantially younger females were treated worse than unattractive males or substantially younger males could also be evidence of sex discrimination, although at some point the "plus" part of the analysis then falls away. Likewise, evidence that substantially younger males and substantially younger unattractive persons were treated better than substantially older males and substantially older unattractive persons could be evidence of age discrimination.

> female employees. [Watkins] took the boyfriend of Ms. Gaskins and allowed him to make gross sexual statements and engage in sexual fondling in the workplace. Gaskins Aff. ¶¶ 17-35. Ms. Herrell testified that [IMH] treated male employees, especially Joe Rahn and Matt Streevall, better than it treated female employees. Herrell Aff. ¶¶ 5-9. Ms. Herrell complained to [Watkins] about the different treatment of male employees, but [Watkins], who had taken away male employee Tim Watkins from Donna Gaskins, did not take any corrective action. *Id.*

Wimmer Surreply at 16-17, No. 67. At the outset, Wimmer's contention is problematic because it is, for the most part, a string of conclusory dramatizations not supported by citations to the record. Furthermore, even if these dramatizations could be reasonably inferred from the actual evidence of record, these statements do not in any way speak to whether and how similarly-situated comparators were treated better in the terms and conditions of their employment or their discharge.

Those portions of her argument that are supported by citations to evidence are likewise insufficient. For example, Gaskins' assertion that "female employees were treated worse than male employees" is a bald conclusion insufficient to support a reasonable jury finding that disparate treatment occurred. Gaskins' more specific statements – for example, "I observed that the male nurse, Joe Rahn, was given preferential assignments, even though his license was on probation" – are a step in the right direction, but they don't go far enough, for there is no evidence regarding whether Rahn was similarly situated to Gaskins (or Wimmer). Importantly, it is not even clear from these statements what nursing certification Rahn had or whether Wimmer sought or was qualified for the "preferential assignments" Rahn allegedly received.

One additional argument bears mention. In support of her age discrimination claim, Wimmer points to Lacy Nelson-Dunham, a woman in her twenties, who she argues was appointed to the full-time position Wimmer had applied for in 2010 through Patsy Cooper. IMH argues that Nelson-Dunham is not a similarly-situated comparator because, among other things,

"the position that Nelson-Dunham sought was not made available until after Wimmer's discharge." IMH Br. at 18. Watkins and Kat Cooper have both confirmed in their affidavits that "[t]he LPN position awarded to Nelson-Dunham first became available and was posted after Wimmer's discharge in September 2010, so Wimmer was never considered for that position." Watkins Aff. at ¶ 11, No. 41-3; Cooper Aff. at ¶ 7, No. 41-1. In fact, it was not until January 2011 that Nelson-Dunham applied for and was selected to fill a vacant full-time position. Watkins Aff. at ¶ 11, No. 41-3; Cooper Aff. at ¶ 7, No. 41-1. Wimmer attempts to dispute this fact, but the evidence she cites does not in any way speak to whether the position Nelson-Dunham applied for and obtained was the position Wimmer applied for. In fact, the evidence she cites does not even indicate whether the position Nelson-Dunham received, although perhaps not "the same," had the same requirements. Nor does it indicate whether Wimmer had the same credentials as Nelson-Dunham. Wimmer cites only her deposition testimony regarding her interactions with Patsy Cooper, Wimmer Resp. at 18, No. 58, but nothing Cooper said to Wimmer reveals anything about the similarity between the positions or their requirements. Wimmer has simply failed to show that Wimmer was similarly situated to Nelson-Dunham with respect to applying for a full-time position.

### D.    Hostile Environment

"Title VII's prohibition against discrimination in employment on the basis of sex encompasses sexual harassment that is sufficiently severe or pervasive to alter the employee's terms or conditions of employment." *Bernier v. Morningstar, Inc.*, 495 F.3d 369 (7th Cir. 2007). In order to establish a prima facie case of sexual harassment under Title VII, the plaintiff must demonstrate that:

> (1) she was subjected to unwelcome sexual harassment in the form of sexual advances, requests for sexual favors or other verbal or physical conduct of a

> sexual nature; (2) the harassment was based on [the individual's] sex; (3) the
> sexual harassment had the effect of unreasonably interfering with the plaintiff's
> work performance in creating an intimidating, hostile or offensive working
> environment that affected seriously the psychological well-being of the plaintiff;
> and (4) there is a basis for employer liability.

*Hall v. Bodine Elec. Co.*, 276 F.3d 345, 354-55 (7th Cir. 2002).

In its motion for summary judgment, IMH contends that the name-calling Wimmer suffered is (1) not based on her gender, and (2) even if it were, not sufficiently severe and pervasive. In response, Wimmer utterly fails to address IMH's contention; instead, she provides various points of law regarding other aspects of hostile environment claims not relevant to IMH's argument. Nevertheless, the Court may only grant summary judgment "if the motion and supporting materials – including the facts considered undisputed – show that the movant is entitled to it," Fed. R. Civ. P. 56(e)(3), and the Court must therefore independently determine whether IMH is entitled to it.

The Court notes at the outset that "Barbie" would be a less apt term for a physically attractive male, and, given that, there is at least some mimimal gender element swept up in the term. However, Wimmer herself speculated that she was called "Barbie" because of her physical appearance and personal grooming standards,[17] which characteristics are, as IMH notes, not the basis of a protected class. Thus, while this term may have a gender element, Wimmer's testimony establishes that her gender is merely coincidental to her coworkers' name-calling. *Huebschen v. Dep't of Health & Soc. Servs.*, 716 F.2d 1167, 1172 (7th Cir. 1983) (defendant treated plaintiff poorly because plaintiff was former lover who had jilted her; gender was "merely coincidental" to defendant's action); *see also King v. Bd. of Regents of Univ. of Wis.*

---

[17] Wimmer testified that she confronted one of her tormentors and asked "how would you like for me to make up a nickname for you, tell everybody that you're Bucky Bucktooth or Billy Bob with no teeth or something, because she didn't have any teeth." Wimmer Dep. at 79:6-11.

*Sys.*, 898 F.2d 533, 540 (7th Cir. 1990) ("The theme of *Huebschen* is that disparate or harassing treatment is not sexually discriminatory if there is a cause other than gender."). In other words, her coworkers targeted her because of a factor personal to her – her appearance and grooming standards – and not because of her gender.

In a similar vein, the epithet "bitch" is typically hurled at females and thus has some gender element.

> It is true that "bitch" is rarely used of heterosexual males (though some heterosexual male teenagers have taken recently to calling each other "bitch"). But it does not necessarily connote some specific female characteristic, whether true, false, or stereotypical; it does not draw attention to the woman's sexual or maternal characteristics or to other respects in which women might be thought to be inferior to men in the workplace, or unworthy of equal dignity and respect. In its normal usage, it is simply a pejorative term for "woman."

*Galloway v. Gen. Motors Serv. Parts Operations*, 78 F.3d 1164, 1168 (7th Cir. 1996), *discussed in Hall v. City of Chicago*, 713 F.3d 325, 334-35 (7th Cir. 2013). Without additional evidence or argument from Wimmer – and there is none – the term by itself is insufficient to support a finding that Wimmer was discriminated on because of her sex. Accordingly, although the Court does not doubt Wimmer's sincerity in asserting that she did not take kindly to the nicknames, the name-calling she suffered is not cognizable as a component of her hostile environment claim.[18]

In her surreply, Wimmer contends for the first time that the incident with Mr. Watkins in Watkins' office, as well as the "sexual fondling" she witnessed between the Watkinses, forms part of her sexual harassment claim. However, Wimmer's own account of these events belies any inference that it was directed at her, much less that it was directed at her *because of her sex.*

---

[18] Contrary to Wimmer's assertions, the Court does not believe there is any gender- or age-specificity with regard to the terms "stupid," "drunken," and "fucking." Wimmer Resp. at 34, No. 58 ("It is unlawful to discriminate against experienced older employees based on the inaccurate assumptions that they are stupid, drunken, or bitches.").

Indeed, Wimmer does not even suggest that the Watkinses engaged in the disfavored "PDA" for any reason other than desire for each other. Simply viewing consensual intimate conduct in the workplace – however distasteful – is insufficient to meet the "based on sex" element of Wimmer's prima facie case. Summary judgment on this claim must therefore be granted.

### E.      Retaliation

Wimmer also contends that she was denied a full-time position and ultimately discharged in retaliation for complaining about name-calling and Watkins and Mr. Watkins' conduct.

Title VII prohibits retaliation by an employer where an employee "has opposed any practice made an unlawful employment practice" or 'has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing" under Title VII. 42 U.S.C. § 2000e-3(a). Like discrimination claims, a plaintiff may establish a prima facie case of retaliation under the direct or indirect method. *Argyropoulos v. City of Alton,* 539 F.3d 724, 733 (7th Cir. 2008). Under either method, the plaintiff must present evidence that she engaged in a statutorily protected activity and she suffered a materially adverse action. *Id.* Under the direct method, she completes her prima facie case with evidence of a causal connection between her protected activity and the adverse action. *Id.* Under the indirect method, the plaintiff instead designates evidence that she met her employer's legitimate expectation and she was treated less favorably than some similarly situated employees who did not engage in the statutorily protected activity. *Id.*

Among other things, IMH argues that Wimmer's "complaints" do not constitute protected activity. As described above, the name-calling Wimmer suffered and the Watkinses' conduct she witnessed were not directed at Wimmer because of her sex. However, "[t]he plaintiff need not show that the practice [she] opposed was in fact a violation of the statute; [she] may be mistaken

26

in that regard and still claim the protection of the statute. *O'Leary v. Accretive Health, Inc.*, 657 F.3d 625, 631 (7th Cir. 2011) (internal citations omitted).  Nevertheless, "[t]he complaint must indicate the discrimination occurred because of sex . . . . Merely complaining in general terms of . . . harassment, without indicating a connection to a protected class or providing facts sufficient to create that inference, is insufficient." *Kodl v. Bd. of Educ. Sch. Dist. 45, Villa Park*, 490 F.3d 558, 563 (7th Cir. 2007) (internal citations omitted).

In response, Wimmer contends that "of course" her complaints involve sex discrimination and sex harassment.[19] Wimmer Resp. at 32, No. 58. However, Wimmer cites no evidence in support of this assertion and makes no further argument on the point. In fact, nothing about Wimmer's complaint to Watkins about being called "Barbie" and "bitch Barbie" indicates a connection to a protected class; rather, Wimmer's complaint explicitly links the harassment to the fact that she ironed her scrubs, washed her hair, brushed her teeth, wore makeup to work, and manicured her nails. Her complaint to Patsy Cooper indicated no more than her reluctance to proceed with the full-time shift application because of "the harassment," which Wimmer testified consisted of the "Barbie" and "bitch Barbie" comments as well as being "set up" by the other nurses. Likewise, nothing in Wimmer's report to Patsy Cooper or Limeberry about the Watkinses' conduct suggests a connection to a protected class. Rather, in those accounts,

---

[19] As before, Wimmer does not explicitly adopt any method of proof. In her surreply, she argues that summary judgment must be denied because IMH did not claim that she could not prove her case of retaliation by the direct method. IMH did, however, move for summary judgment on her retaliation *claim*. Fed. R. Civ. P. 56(a). *Compare Cloe v. City of Indianapolis*, 712 F.3d 1171 (7th Cir. 2013) ("[T]he City's brief in support of summary judgment did not put Cloe on notice that her discriminatory termination claim would be at issue."). If Wimmer believes that she could survive summary judgment on the direct method, she should have articulated that argument in her response.

Wimmer gives an eyewitness account of what she had walked in on and then expresses incredulity. Such "complaints" do not constitute protected activity.[20]

Finally, in her count 3, Wimmer also contends that she was denied a position and discharged in part because she opposed age discrimination. In her surreply, Wimmer cites a section of her deposition wherein she explains why she thinks she didn't get the positions she applied for. According to Wimmer, it was "number one, I was older. I didn't go out drinking with [Watkins] and her group." Wimmer Dep. at 177:22-178:11. However, nothing in Wimmer's testimony indicates that she ever voiced this concern. There is therefore no evidence that Wimmer ever opposed age discrimination, and IMH is therefore entitled to summary judgment on this claim. As a result, summary judgment on Wimmer's retaliation claim as a whole must be granted.

## IV.    CONCLUSION

For the foregoing reasons, IMH's motion for summary judgment is **GRANTED** in its entirety.

SO ORDERED:    06/07/2013

_William T. Lawrence_

Hon. William T. Lawrence, Judge
United States District Court
Southern District of Indiana

Copies to all counsel of record via electronic communication.

---

[20]  Because this analysis is dispositive, the Court expresses no opinion on IMH's alternative argument that Wimmer has not identified any similarly situated comparator who was treated more favorably.

28